## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FRESENIUS KABI USA, LLC, | Case No. 4:18-cv-3109 |
| **Plaintiff,** | |
| v. | |
| STATE OF NEBRASKA; THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; and SCOTT FRAKES, in his official capacity as Director of the Nebraska Department of Correctional Services, | BRIEF IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION |
| **Defendants.** | |

Defendants State of Nebraska, the Nebraska Department of Correctional Services, and Scott Frakes, in his official capacity as the Director of the Nebraska Department of Correctional Services, submit this brief in opposition to Plaintiff's motion for temporary restraining order and motion for preliminary injunction.

## INTRODUCTION

One week before the scheduled execution of Carey Dean Moore on August 14, 2018, Plaintiff filed suit in this Court based on information in the public domain in November 2017, purportedly linking itself to the substances in the State's possession. Applying this tactic, any commercial interest associated with any product used in an execution, however remote, could file a last moment lawsuit to prevent an execution—regardless of the method.

Plaintiff essentially asserts its speculative commercial harm will result from public knowledge that its product may be used in a lethal injection. But, pursuant to Nebraska law, the Nebraska Department of Correctional Services has not disclosed the identities of any supplier or manufacturer of the substances in its possession. Whatever link may or may not exist between Plaintiff and the State's substances was first, and to this point only, made public by Plaintiff itself. Indeed, Plaintiff repeatedly complains the State has not done the very thing it states will cause Plaintiff injury.

This brief will address several issues. First, the State will provide as a factual background the particulars of Nebraska's lethal injection process and provide a current situational update as to Nebraska's possession of lethal substances and its inability to acquire any additional substances. The brief will then address the well-settled *Dataphase* framework.

## FACTUAL BACKGROUND

In Nebraska, "a sentence of death shall be enforced by the intravenous injection of a substance or substances in a quantity sufficient to cause death. The lethal substance or substances shall be administered in compliance with an execution protocol created and maintained by the Department of Correctional Services." Neb. Rev. Stat. § 83-964. Nebraska's Execution Protocol, at 69 Neb. Admin. Code, ch. 11, describes the process and procedures by which an execution will be carried out consistent with Neb. Rev. Stat. § 83-965. The protocol requires that the first or only substance injected be capable of rendering the convicted person unconscious and that a determination sufficient to reasonably verify that the convicted person is

2

unconscious be made before the administration of any additional substances, if any. Filing 26-1 at 20.

The Director of the Nebraska Department of Correctional Services is required to determine and acquire the substances to be employed in an execution by lethal injection. Filing 26-1 at 20. The Director's determination of the substance or substances to be employed in an execution by lethal injection may be based on the availability of necessary substances, provided that the substance or substances can be intravenously injected in a quantity sufficient to cause death without the unnecessary and wanton infliction of pain. *Id.*; 69 Neb. Admin. Code, ch. 11, § 008.02. Applicable here, the Director based his determination upon his reliance upon the expert opinions of qualified pharmacological and medical anesthesiology experts after also obtaining legal advice from the Attorney General's Office. Filing 26-1 at 2.

Lethal substances used in a lethal injection execution are difficult, if nearly impossible, to obtain. This problem is not limited solely to Nebraska, but exists in other death penalty states. Filing 26-1 at 5. In search of substances to be administered for execution by lethal injection, the Director contacted at least forty potential suppliers and six other states. Filing 26-1 at 5. Only the current supplier was willing to provide substances to be administered by lethal injection. Filing 26-1 at 5.

The substances at issue here were obtained from a licensed pharmacy in the United States and were not obtained by any fraud, deceit or misrepresentation. Filing 26-1 at 3. The Nebraska Department of Correctional Services did not engage in any

3

measures to circumvent Fresenius Kabi's distribution control. Filing 26-1 at 3. The Nebraska Department of Correctional Services does not and did not have any contract with Fresenius Kabi. Filing 26-1 at 3. The Nebraska Department of Correctional Services has not disclosed the identities of any supplier or manufacturer of the substances in its possession. Filing 26-1 at 6. The current supplier is unwilling to provide additional substances. Filing 26-1 at 5. The Director does not have an alternative supplier for any of the four substances to be administered for execution by lethal injection. Filing 26-1 at 6.

**The expiration date of one of the substances is August 31, 2018.** Filing 26-1 at 2. This means any legal delay of the upcoming execution beyond this date will render the State unable to carry out Moore's sentence.

Nebraska's process includes several significant and relatively lengthy phases. The protocol requires the Director to  notify the condemned inmate of the determination of the substance or substances, quantity and, if more than one substance is to be employed in an execution by lethal injection, the order the substances will be administered, at least 60 days prior to the Nebraska Attorney General requesting an execution warrant from the Nebraska Supreme Court. 69 Neb. Admin. Code, ch. 11, § 008.02. Applicable here, the Director notified Carey Dean Moore of this information on January 19, 2018. Filing 26-1 at 2, 23.

The protocol also requires the substances be chemically analyzed and verified at least 60 days prior to the Nebraska Attorney General requesting an execution warrant from the Nebraska Supreme Court. 69 Neb. Admin. Code, ch. 11, § 008.05.

4

Applicable to the pending execution of Carey Dean Moore, the substances were chemically analyzed and verified as required by 69 Neb. Admin. Code, ch. 11, § 008.05, more than 60 days prior to the request for the warrant. Filing 26-1 at 3.

Only after completing these steps does the Attorney General move the Nebraska Supreme Court for an execution warrant pursuant to Neb. Rev. Stat. § 29-2543. Here, the Attorney General requested an execution warrant on April 3, 2018, and the Nebraska Supreme Court issued the warrant on July 5, 2018.

In sum, the State employs a lengthy administrative process to acquire, test, and notify the condemned inmate of the substances to be used in the execution. This is followed by a lengthy process to request an execution warrant. Combined with the near impossibility of obtaining substances and the always impending expiration dates of the substances, the window to carry out a final death penalty sentence is narrow. It can only be opened for 24 hours when the Nebraska Supreme Court issues an execution warrant for a specific day.

The State of Nebraska does not have another equally or more feasible and readily implemented method for the execution of Carey Dean Moore, as ordered by the Nebraska Supreme Court.  Filing 26-1 at 4-5. Any temporary restraining order or injunction would harm and prevent the State of Nebraska from carrying out the Nebraska Supreme Court's execution warrant for Nebraska's final death penalty sentence of Carey Dean Moore, who has raised no objections or impediments nor filed any pending court proceeding to stop, stay, or delay the Nebraska Supreme Court's

5

current execution warrant. Filing 26-1 at 4. Put simply, the window will close on August 31, 2018. Possibly for good.

## LEGAL STANDARD

"[A] preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted." *Home Instead, Inc. v. Florance,* 721 F.3d 494, 500 (8th Cir. 2013) (Riley, C.J., dissenting) (quoting *Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1568 (Fed. Cir. 1993)). The burden of establishing the propriety of an injunction is on the movant. *Roudachevski v. All-American Care Centers, Inc.,* 648 F.3d 701, 705 (8th Cir. 2011).

When evaluating whether to issue a preliminary injunction, a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981) (en banc).

The burden on a movant to demonstrate that an injunction is warranted is heavier when granting the preliminary injunction will in effect give the movant substantially the relief it would obtain after a trial on the merits. *Rathmann Grp. v. Tanenbaum,* 889 F.2d 787, 790 (8th Cir. 1989).

6

# ARGUMENT

## I. PLAINTIFF IS NOT ENTITLED TO A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION.

### A. Plaintiff has failed to make a showing of irreparable harm.

"The absence of irreparable injury is by itself sufficient to defeat a motion for a preliminary injunction." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015) (internal quotation omitted). To succeed in demonstrating a threat of irreparable harm, "a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski,* 648 F.3d at 706 (quoting *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n,* 109 F.3d 418, 425 (8th Cir. 1996)).

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 914-15 (8th Cir. 2015) (internal quotation omitted). "Economic loss, on its own, is not an irreparable injury so long as the losses can be recovered." *Id.* at 915 (internal quotation omitted). Loss of intangible assets such as reputation and goodwill can constitute irreparable injury. *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).

Plaintiff bases the entirety of its irreparable harm argument on the notion that it will suffer "noncompensable injury to its goodwill, reputation, and business relationships among its customers, its investors, its end users, and to the public at large who are all potential end users of Fresenius Kabi's products" in the absence of

7

a preliminary injunction. Filing 11 at 14. That being the extent of Plaintiff's claimed irreparable harm, its request for preliminary relief must fail on this prong alone.

At the threshold of this analysis, the Court should pause and consider the internally inconsistent and self-defeating nature of Plaintiff's irreparable harm argument as a whole. Plaintiff imagines it is about to suffer a panoply of reputational and economic injuries because it believes Nebraska is about to use Plaintiff-made substances in a lethal injection execution *and* because the world—including Plaintiff's customers, investors, and regulators—will know about it. Critically, Plaintiff does not presently know with certainty whether it actually did make Nebraska's substances. Nor, at present, does the rest of the world. Putting aside whether that may change depending on the outcome of separate public records litigation pending before the Nebraska Supreme Court, by the very filing of this lawsuit Plaintiff has itself brought increased attention and publicity to the prospect of its substances being used in an execution. Indeed, the State has been steadfast in its litigation efforts to uphold Nebraska law and prevent exactly the sort of publication that Plaintiff has effectively spotlighted. Thus, to the extent any of its reputational harm claims carry weight (they cannot, as explained more fully below), some of that harm will have been self-inflicted.

More specifically, all of Plaintiff's theories of harm require the Court to accept an attenuated and speculative chain of inferences regarding the behavior and economic decisions of numerous far-flung persons and entities. This is insufficient to make a concrete showing of the *irreparable* harm required for a preliminary

8

injunction. Just as in the injury analysis for standing purposes, "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n. 5 (2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). Here, Plaintiff asks the Court to divine the imminent pharmaceutical purchase decisions of physicians and other end-users, divestment decisions by institutional investors, and even regulatory action decisions by the European Commission. Filing 11 at 6-7. The chain of events imagined by Plaintiff depends in its entirety on future choices made by independent actors not before this Court. As in *Clapper*, this "speculative chain of possibilities does not establish that injury based on [these actors' potential future decisions] is certainly impending." 568 U.S. at 414.

Relatedly, Plaintiff's injury theories suffer from a comprehensive failure of proof. Although voluminous, Plaintiff's submissions in support of its preliminary injunction motion are wholly without any primary-source evidence to substantiate Plaintiff's claims that it faces some sort of customer or investor revolt if it were to be directly associated with a lethal injection protocol. At best, Plaintiff has presented the testimony of one of its own executives to speculate on possible European regulatory restrictions on drug exports, and rank speculation over possible institutional divestment from Plaintiff's shares based on scattered and unrelated news reports and shareholder resolutions regarding different firms.[1] Filing 11 at 7-9.

---

[1] In Plaintiff's Complaint (Filing 1 at 6-7), and again in its brief (Filing 11 at 6, 14), Plaintiff makes oblique reference to its customers' membership in professional

And on the issue of whether Plaintiff's customers will turn to other manufacturers upon possibly learning of Plaintiff's drug being used in an execution, Plaintiff's speculation is even more striking. Again, the only evidence Plaintiff has offered in support of this notion are the medical professional association policies attached to the Complaint. *See* Filing 1 at 6-7; Filing 1-8; Filing 1-9; Filing 1-10; Filing 1-11; Filing 1-12; Filing 1-13; Filing 1-14; Filing 1-15; Filing 1-16. That is it. There are no declarations from current customers (of any size) that they will cease doing business with Plaintiff, no public denunciations, no letters of protest to company executives, or anything of the like. There are only the organizational policy papers "disavowing" capital punishment, a conclusory statement that Plaintiff's customers are members of said organizations, and an implied request that the Court make the inferential leap from these two facts to the conclusion that a mass of Plaintiff's customers are about to jump ship to new manufacturers.

Plaintiff may recognize the thinness of its reasoning on this point, for in the actual irreparable harm section of its argument, after the deployment of so much "evidence" purporting to illustrate the impending business decisions of the diverse customer base of a major pharmaceutical company, Plaintiff merely proclaims that "customers may factor this in to their decision about whether to turn to other manufacturers." Filing 11 at 14.

---

organizations that have "disavow[ed] any association between their respective professions and capital punishment."

The record (to the extent it even contains admissible evidence) consists simply of Plaintiff declaring for itself its own worries and speculation as to what numerous disparate and independent actors might do at some unspecified future date. This sort of "possible or speculative harm" is not enough for a preliminary injunction. *Doe v. LaDue*, 514 F. Supp. 2d 1131, 1135 (D. Minn. 2007).

Plaintiff's remaining irreparable harm arguments also lack merit. Plaintiff does not even attempt to support its argument that somehow a drug shortage will result from the pending execution. Filing 11 at 16. Moreover, that argument appears on its face to be an effort by Plaintiff to adopt for itself the injuries of others (*i.e.*, customers unable to obtain needed substances). The notion that a drug *manufacturer* would suffer—economically or otherwise—from the scarcity of its product is imaginative, at best. There simply is no support for this theory. Likewise for Plaintiff's other concluding argument, which brazenly injects into this case speculative argument regarding the possibility of a "botched" execution. This point, tucked at the back of Plaintiff's irreparable harm argument, is as devoid of evidentiary support as it is inflammatory.

Plaintiff's irreparable harm arguments are economic in nature (and therefore by definition *not* irreparable), facially speculative, or dependent on the independent business decisions of countless diverse third parties not even identifiable by the Court. The Plaintiff has failed to make its necessary showing of irreparable harm and thus is not entitled to the preliminary relief it seeks.

**B. Plaintiff is not likely to succeed on its claims.**

**1.      State law claims.**

Plaintiff claims the State has engaged in tortious interference with a business relationship and seeks the remedy of replevin.

Before turning to the merits of Plaintiff's individual state law claims, it is necessary to address Plaintiff's apparent attempt to retroactively restrict the subsequent use of two substances previously acquired by the Department prior to June 22, 2018, and then sue for a restraining order and temporary injunction. Plaintiff's assertions on this are objectively wrong. Plaintiff's own evidence shows that the distribution controls on which Plaintiff's argument is based were not created until June 22, 2018. *Compare* Filing 9 at 83 (2012 controls limited to Diprivan and Propofol), *with* Filing 9 at 85-86 (June 22, 2018 schedule of restricted products listing potassium chloride and cisatracurium besylate). On this basis alone, Plaintiff has failed to meet its factual burden regarding its purported distribution controls that serve the basis of its state law claims.

Moreover, Plaintiff's state law claims against the State, the Department (an agency of the State of Nebraska) and Director Frakes in his official capacity are in actuality against the State itself. *See Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office and, as such, is no different from a suit against the state itself.). Accordingly, such state law claims are barred by Eleventh Amendment immunity.

"The test for determining whether a State has waived its immunity from federal court jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985). A State "is deemed to have waived its immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." *Id*. at 239–40. Importantly, "[a] State's general waiver of sovereign immunity is insufficient to waive Eleventh Amendment immunity; the state must specify an intent to subject itself to federal court jurisdiction." *Santee Sioux Tribe of Neb. v. Nebraska*, 121 F.3d 427, 431 (8th Cir. 1997). In this case, Plaintiff has failed to argue, much less demonstrate, that the State of Nebraska has waived its Eleventh Amendment immunity to suit in federal court.

### a. Tortious interference.

Plaintiff claims the State has engaged in tortious interference with its business relationships. Although Plaintiff disclaims any request for monetary damages, its tortious interference claim is based on allegations relating to the past acts of acquiring substances and not returning them. A declaratory judgment establishing only the past liability of a state is forbidden by the state's sovereign immunity preserved by the Eleventh Amendment. *Verizon Maryland, Inc. v. Public Service Com'n of Maryland*, 535 U.S. 635,646 (2002).

First, there is likely an outright sovereign immunity bar. To the extent Plaintiff impliedly seeks to recover damages for past acts (*i.e.,* as a tort claim), the

13

Eleventh Amendment would bar the claim. This Court concisely set out the principles

that govern this issue in *Miller v. Nebraska Department of Correctional Services*:

State Tort Claims Act

First, the defendants correctly assert that the Eleventh Amendment to
the United States Constitution bars the plaintiff from bringing his claim
under the State Tort Claims Act in this court. See generally *Hess v. Port
Authority Trans–Hudson Corp.,* 513 U.S. 30, 39-40, 115 S.Ct. 394, 130
L.Ed.2d 245 (1994): "The Eleventh Amendment largely shields States
from suit in federal court without their consent, leaving parties with
claims against a State to present them, if the State permits, in the
State's own tribunals."

The Nebraska Legislature has waived sovereign immunity for certain
kinds of tort actions against the State and its agencies. See *Neb. Rev.
Stat. §§ 81-8,209 et seq.,* the Nebraska State Tort Claims Act. However,
the waiver of sovereign immunity under the State Tort Claims Act does
not extend to actions maintained in federal court. See Neb. Rev. Stat. §
81-8,214: "Suits shall be brought in the district court of the county in
which the act or omission complained of occurred or, if the act or
omission occurred outside the boundaries of the State of Nebraska, in
the district court for Lancaster County." Thus, § 81-8,214 is a limited
waiver of sovereign immunity which permits an action against the State
or a state agency exclusively in state district court.

The court's general ability to exercise supplemental jurisdiction does not
override the sovereign immunity of the states recognized and preserved
by the Eleventh Amendment. Therefore, the plaintiff's claim(s) under
the State Tort Claims Act will be dismissed without prejudice, and the
plaintiff may file such claim(s) in the appropriate state court.

*Miller v. Nebraska Department of Correctional Services*, 2005 WL 3072198, at *1 (D.

Neb. 2005).

This claim also fails on its merits. To succeed on a claim for tortious

interference with a business relationship, a plaintiff must prove (1) the existence of a

valid business relationship or expectancy, (2) knowledge by the interferer of the

relationship or expectancy, (3) an unjustified intentional act of interference on the

14

part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. *Thompson v. Johnson*, 299 Neb. 819, 828, 910 N.W.2d 800, 806–07 (2018).

"Liability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Hogan v. Cox Commc'ns*, L.L.C., No. 8:04CV368, 2005 WL 3358922, at *6 (D. Neb. Dec. 9, 2005) (*quoting Mueller v. Abdnor*, 972 F.2d 931, 938 (8th Cir.1992)). Since, as explained above, Plaintiff's theories of harm require the Court to accept an attenuated and speculative chain of inferences regarding the behavior of and economic decisions of numerous far-flung persons and entities, Plaintiff has not met its burden under a tortious interference theory.

More specifically, Plaintiff's evidence is insufficient to satisfy the fourth element. Plaintiff cannot prove the alleged harm posed to its business relationships are caused by any acts of Defendants. In finding causation for a claim of tortious interference with prospective business relations, courts apply a "but-for" test. *See e.g., Tamko Roofing Prod., Inc. v. Smith Eng'g Co.*, 450 F.3d 822, 830 (8th Cir. 2006) (applying Missouri law); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1506 (8th Cir. 1992) (applying Minnesota law) ("With regard to causation, [Plaintiff] must prove…that [it] would not have suffered its alleged losses but for [Defendant's] wrongful conduct.") (internal citations omitted).

15

Plaintiff does not point to any evidence linking its alleged business losses to any particular act of the State.  The Nebraska Department of Correctional Services has not disclosed the identities of any supplier or manufacturer of the substances to be administered for execution by lethal injection in its possession.  Filing 26-1 at 6. The act of executing Moore, in and of itself, will not cause harm to Plaintiff's business relationships. Very possibly, Plaintiff's own actions are the cause of any threat posed to Plaintiff's business relationships.  By filing suit, Plaintiff stepped into the spotlight and left its customers, investors, and end users to speculate as to whether it was the source of the substances to be administered for execution. If Plaintiff sustains any harm to its business relations, it will not have been caused by acts of the State. Given that causation is an essential element for a claim of tortious interference with business relations, Plaintiff's claim fails on this element alone.

Accordingly, regardless of how Plaintiff characterizes its requested relief, Plaintiff is not likely to prevail on its tortious interference claim.

### b. Replevin.

The jurisdictional bar of the Eleventh Amendment applies regardless of the nature of the relief sought. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This includes Plaintiff's attempt to bring a state law replevin claim against the State in federal court. *See Pemrick v. Stracher,* No. 92 CV 959 CLP, 2007 WL 1876504, at *5 (E.D.N.Y. June 28, 2007), aff'd, 331 F. App'x 17 (2d Cir. 2009).

In Nebraska, a person seeking to recover possession of personal property may file a replevin action. Neb. Rev. Stat. § 25-1093. But the State of Nebraska has not

consented to be sued in federal court on the state law claim of replevin. And although a State can expressly waive sovereign immunity, the test for waiver is "a stringent one," and the statutes providing for a replevin action include no such "clear declaration" of waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999).

On the merits, the evidence does not support Plaintiff's position. The substances at issue here were obtained from a licensed pharmacy in the United States and were not obtained by any fraud, deceit or misrepresentation. Filing 26-1 at 3. The Department of Correctional Services did not engage in any measures to circumvent Fresenius Kabi's distribution control. *Id*. The Department does not and did not have any contract with Fresenius Kabi. *Id*. The Department has not disclosed the identities of any supplier or manufacturer of the substances in its possession. Filing 26-1 at 6.

More specifically, as described above, Plaintiff's own evidence exposes Plaintiff's apparent attempt to retroactively restrict the subsequent use of two substances previously acquired by the Department prior to June 22, 2018, and then sue for a restraining order and temporary injunction,

Nor has Plaintiff provided any legal support for its position. Plaintiff's distribution controls are not restrictive covenants that give it an enforceable reversionary property interest against the Director. "It is also a general rule of the common law that a contract restricting the use or controlling subsales cannot be annexed to a chattel so as to follow the article and obligate the subpurchaser by operation of notice. A covenant which may be valid and run with land will not run

17

with or attach itself to a mere chattel." *John D. Park & Sons Co. v. Hartman*, 153 F. 24, 39 (6th Cir. 1907). Use restrictions on third-party end-users infringe the right of alienation. "The right of alienation is one of the essential incidents of a right of general property in movables, and restraints upon alienation have been generally regarded as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass from hand to hand." *Id*. at 39.

The Supreme Judicial Court of Massachusetts's decision in *Garst v. Hall & Lyon Co.*, 61 N.E. 219 (Mass. 1901), is an apt illustration. There, the plaintiff manufactured a proprietary medicine called "Phenyo-Caffein," made from a secret formula. *Id*. "The plaintiff [sold] all Phenyo-Caffein subject to the conditions of a contract in which each purchaser agrees that he will not sell nor allow any one in his employ to sell it for prices less than those specified in the agreement for the different sizes of boxes, and promises to pay the plaintiff an agreed sum as damages if he violates this contract." *Id*.

The defendant, "with full knowledge of the conditions under which the medicine is sold by the plaintiff," acquired the medicine in large quantities and intended to resell it in violation of those conditions. *Id*. The defendant did not have a contract or agreement with the plaintiff, nor did the defendant buy the medicine from "the firm of wholesalers who received it from the plaintiff, and who agreed to sell it subject to the above conditions." *Id*. Rather, the defendant "bought it of a person who bought either from this firm or from a purchaser from this firm." *Id*. The plaintiff

sued to stop defendant's resale on terms that conflicted with the plaintiff's contract with its intermediary wholesalers. *See id.*

The court held that "[t]he purchaser from a purchaser has an absolute right to dispose of the property. He may consume it, or sell it to another. The plaintiff has contracts from his vendees in regard to the prices at which they will sell if they sell at all. If they sell in violation of their contracts with the plaintiff, he has a remedy against them to recover his damages. This right is founded on the personal contract alone, and it can be enforced only against the contracting party." *Id.* (internal citation omitted). The court rejected the plaintiff's contention that the resale condition attached to, and ran with, the medicine. "To say that this contract is attached to the property, and follows it through successive sales which severally pass title, is a very different proposition. We know of no authority, not of any sound principle, which will justify us in so holding." *Id.* at 219-20.

Setting aside whether the State even possesses Plaintiff's products, and whether Plaintiff had an enforceable contract with the supplier that restricted the sale or use of its products, the State is in the same position as the defendant in *Garst.* Such a contract condition would only bind the supplier, as Plaintiff's distributor. Even if the State purchased Plaintiff's product, it did not purchase the product from Plaintiff and the State had no direct contract or contact with Plaintiff concerning the purchase of lethal substances. Plaintiff's resale condition with its distributor would not create a reversionary property interest that attached to the substance and

followed to successive purchasers. To the extent Plaintiff has any complaint, it is under its alleged contract with the entity it believes breached the contract.

The primary case cited by Plaintiff does not support its position. In *Tempur-Pedic Int'l, Inc. v. Waste To Charity, Inc.*, No. 07 2015, 2007 WL 535041 (W.D. Ark. Feb. 16, 2007), a mattress manufacturer received an ex parte TRO against a charitable organization that was reselling donated mattresses in violation of a contract between them. The TRO extended to apparent third-party agents that co-conspired with the charitable organization in "a scheme to defraud Tempur-Pedic by selling misappropriated mattresses for profit, below retail value and in contravention of the general purpose of Tempur-Pedic's donation of the goods." *Id.* at 1. The third parties do not appear to be independent purchasers. The opinion does not mention whether the third parties purchased the mattresses from the charitable organization. But the court noted that within a day of the manufacturer's investigative inquiry to the charitable organization, the third parties were no longer willing to resell the mattress. *Id.* at *3. The court implied that the charitable organization warned the third parties that the manufacturer was snooping. *See id.*

Additionally, the court emphasized that it was treating the charitable organization as a *thief* who could not pass good title. The court cited an Arkansas case with the parenthetical explanation that "[t]he general rule - as regards all personal property except money and negotiable paper - is, that a purchaser from a thief acquires no title against the true owner, in the absence of limitations and estoppel." *Id.* at *7 (quoting *Eureka Springs Sales Co. v. Ward*, 290 S.W.2d 434, 436 (Ark. 1956)).

20

By treating the charitable organization as a thief, the manufacturer was not trying to enforce a use restriction or servitude on a good, like Plaintiff is attempting to do here. The mattress manufacturer was simply recovering stolen property. This is an unremarkable proposition. Plaintiff has not, and could not, make a claim that a supplier selling its product to the State is a thief unable to transfer title to the State.

Accordingly, Plaintiff is unlikely to succeed on its replevin claim.

### 2.      Federal claims.

Plaintiff named the State of Nebraska and the Nebraska Department of Correctional Services in this action. Since the State and its agencies are not "persons" subject to suit under 42 U.S.C. § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989), § 1983 does not create a cause of action against the State of Nebraska and the Nebraska Department of Correctional Services.

While Plaintiff may pursue § 1983 claims for prospective injunctive relief against Director Frakes in his official capacity, Plaintiff is unlikely to succeed on the merits of those claims.

### a.  Due process clause.

Plaintiff claims a series of due process violations related to its alleged speculative commercial harm will result from public knowledge that its product may have been used in a lethal injection. To state a claim under the Fourteenth Amendment's Due Process Clause, a plaintiff must allege the deprivation of a protected interest without due process of law. *Demien Construction Co. v. O'Fallon Fire Protection District*, 812 F.3d 654, 658 (8th Cir. 2016); *Barnes v. City of Omaha*,

574 F.3d 1003, 1005-06 (8th Cir. 2009). "Protected interests under the Due Process Clause are those to which a person holds a 'legitimate claim of entitlement,' and stem from 'independent source[s] such as state law.'" *Id.,* (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

First, Plaintiff fails in its attempt to state a cause of action for violation of due process based upon alleged future damage to its reputation by the use of its products in an execution.  Filing 1 at 9, 13;  Filing 11 at 29.  Plaintiff has failed to sufficiently plead deprivation of a constitutionally protected liberty or property interest. Plaintiff's Complaint contains only conclusory and speculative statements of injury. Moreover, the United States Supreme Court has made clear that injury to reputation alone is not sufficient to state a § 1983 claim.  *Paul v. Davis*, 424 U.S. 693, 712 (1976). While a state may protect against injury to reputation by virtue of its tort law, an interest in reputation "is neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law."  *Id*.

Plaintiff makes reference to a "stigma plus" line of cases which derive from *Paul v. Davis*.  In discussing *Paul v. Davis*, the Eighth Circuit Court of Appeals has explained that the Supreme Court suggested therein that reputational harm coupled with more tangible interests such as employment can together be sufficient to invoke due process protection. *Jones v. McNeese*, 746 F.3d 887, 898 (8th Cir. 2014).  However, that line of cases is not applicable here.  An essential element of those cases is that the government has publicly and voluntarily disclosed the false and stigmatizing information.  *Quinn v. Shirey*, 293 F.3d 315, 320 (6th Cir. 2002).  Even assuming that

22

Plaintiff's products are at issue here, there is no allegation that the State of Nebraska has publicly disclosed that Plaintiff's products have been purchased by the State for use in an execution. Indeed, it is the Plaintiff that has come forward in this litigation to make known that it believes its products will be used. And Plaintiff has alleged the State has not disclosed this information.

In *Parrino v. Price*, 869 F.3d 392 (6th Cir. 2017), a pharmacist who was excluded from participating in federal health care programs after pleading guilty to a misdemeanor crime, failed to state a due process claim, in part, because he failed to allege that a governmental agency publicly disclosed his exclusion. While recognizing the line of stigma plus cases, the Second Circuit Court of Appeals also held a towing company failed to establish any due process violation when it failed to establish that any stigmatizing statements were publicized by the defendant state police officers. *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049 (2d Cir. 1993).

Second, as explained in response to Plaintiff's replevin claim, the Plaintiff does not have any property interest in a product allegedly purchased by a downstream purchaser. This is particularly true when, as described above, the substances were acquired prior to Plaintiff's alleged June 22, 2018, distribution controls. *See* Filing 9 at 85-86.

Third, to the extent Plaintiff does sustain some injury from the release of information that has so far not been released, an equally serviceable remedy exists that provides process in abundance: the State Tort Claims Act.

### b. Commerce clause.

Plaintiff claims Director Frakes has violated the dormant Commerce Clause by purchasing a product in interstate commerce. The dormant commerce clause prohibits states from enacting laws that "discriminate against or unduly burden interstate commerce." *Jones v. Gale*, 470 F.3d 1261, 1267 (8th Cir. 2006). The purchase of a product is not the regulation of commerce and Plaintiff cites no case law to support its position. This claim borders on lacking even a colorable claim to merit.

"To ascertain whether a state activity violates the dormant Commerce Clause, we begin by determining whether the state is 'regulating' the market or merely 'participating' in it." *Nat'l Solid Waste Mgmt. Ass'n v. Williams*, 146 F.3d 595, 599 (8th Cir. 1998). Because the power granted to Congress under the Commerce Clause is the power to "*regulate* Commerce ... among the several States," the correlative restrictions on the states under the Commerce Clause are invoked only when a state engages in regulation. "Therefore, the Supreme Court has drawn a distinction between state 'regulation of' a market and state 'participation in' a market." *Chance Mgmt., Inc. v. State of S.D.*, 97 F.3d 1107, 1110 (8th Cir. 1996). "A state acting as a market participant is free from the strictures of the Commerce Clause because 'there is no indication that the [Commerce] Clause was intended to limit the ability of the [s]tates themselves to operate in the free market.'" *Id.* Plaintiff does not allege the State has engaged in any regulation and, at most, has alleged the State purchased a product acting as a market participant.

24

Plaintiff is unlikely to succeed on its Commerce Clause claim.

### C. The public interest and balance of harms weigh against the issuance of a preliminary injunction.

In conducting the "balance of harms" analysis required under *Dataphase,* an illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1023 (8th Cir. 1992). To determine what must be weighed, courts have looked at the threat to each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994). The goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction issued. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). On the public interest prong of the *Dataphase* test, the court must consider both what public interests might be injured and what public interests might be served by granting or denying a preliminary injunction. *Scott v. Benson*, 863 F. Supp. 2d 836, 844 (N.D. Iowa 2012). Given the similarity of the analysis on these prongs, they will be addressed together. *See, e.g.*, *Cy Wakeman, Inc. v. Nicole Price Consulting, LLC*, 284 F. Supp. 3d 985, 995 (D. Neb. 2018).

This analysis is straightforward. As a fundamental matter, the State of Nebraska has a legitimate interest in carrying out a sentence of death in a timely and constitutional manner. *See Baze v. Rees*, 553 U.S. 35, 61 (2008). As Director Frakes' affidavit makes clear, the substances currently in the Department's possession will expire at the end of this month. Filing 26-1 at 2. The Department does not have an

alternative supply of either these or different substances available to it at this time. Filing 26-1 at 6. Considering this practical reality in conjunction with Nebraska law as to the issuance or stay of an execution warrant, Filing 26-1 at 4, granting Plaintiff the preliminary relief it seeks would effectively freeze the State's ability to fulfill its duty and carry out the lawful execution of Carey Dean Moore for the foreseeable future.

Given the ongoing "guerilla war against the death penalty," Transcript of Oral Argument at 14:20-25, *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (No. 14-7955) (question of Alito, J.), which war is now also being waged by drug companies themselves as exemplified by this lawsuit, that freeze could be permanent. So, not only would a preliminary injunction conflict in the immediate term with the public's interest in having lawful death sentences carried out when constitutionally feasible (*i.e.*, now), it could serve to irreparably and permanently burden that interest.

Plaintiff accounts for none of this in its conclusory public interest and balance of harms arguments. It simply assumes the availability of alternative lethal substances and boldly assumes for itself the mantle of representing the public interest based on its corporate policy preferences for how lawful purchasers of its products choose to use those products.

Plaintiff pits its private pecuniary (and speculative) interests against the concrete and immediate interests of a sovereign State. Carey Dean Moore has been duly sentenced to death for the murders he committed and that sentence is final. The people of Nebraska have chosen by a wide margin to retain capital punishment for

26

Moore's crimes. Their government is prepared to carry out Moore's sentence and possesses the constitutional, lawfully-acquired means of doing so. Plaintiff, with insufficient evidence, no showing of irreparable harm, and no likelihood of success on the merits of its claims, seeks to upend these interests with its request for a preliminary injunction. The Court should decline Plaintiff's request.

## CONCLUSION

The Plaintiff's motion for temporary restraining order and motion for a preliminary injunction should be denied.

Respectfully submitted August 9, 2018.

> **STATE OF NEBRASKA; THE NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES; and SCOTT FRAKES, in his official capacity as Director of the Nebraska Department of Correctional Services, Defendants.**
>
> By:    DOUGLAS J. PETERSON
>        Attorney General of Nebraska
>
>        *s/ Ryan S. Post*
>        RYAN S. POST, NE #24714
>        DANIELLE L. JONES, NE #25505
>        Assistant Attorneys General
>
>        JAMES D. SMITH, NE #15476
>        Solicitor General
>
>        DAVID A. LOPEZ, NE #24947
>        Deputy Solicitor General
>
>        OFFICE OF THE ATTORNEY GENERAL
>        2115 State Capitol
>        Lincoln, Nebraska 68509
>        (402) 471-2682
>        Ryan.Post@nebraska.gov

27

Dave.Lopez@nebraska.gov
James.Smith@nebraska.gov
Danielle.Jones@nebraska.gov
<u>Attorneys for Defendants.</u>

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2018, I electronically filed the foregoing document with the Clerk of the United States District Court for the District of Nebraska, using the CM/ECF system, causing notice of such filing to be served upon all parties' counsel of record.

By:   *s/ Ryan S. Post*