IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| FRESENIUS KABI USA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 4:18CV3109 |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF NEBRASKA, | ) | **MEMORANDUM** |
| NEBRASKA DEPARTMENT OF | ) | **AND ORDER** |
| CORRECTIONAL SERVICES, and | ) | |
| SCOTT FRAKES, in his Official | ) | |
| Capacity as Director of the Nebraska | ) | |
| Department of Correctional Services, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

*The Time Has Come*

While he is not a party, Carey Dean Moore is at the center of this lawsuit. Legal realism and common decency require that he not be forgotten.[1]

Mr. Moore is scheduled to die by lethal injection on Tuesday, August 14, 2018, at 10:00 a.m. Mr. Moore, 60, has spent nearly four decades on death row for the coldly calculated 1979 killings of Omaha cabdrivers Reuel Van Ness and Maynard Helgeland.

---

[1] I take judicial notice of state court records and publicly available documents. *See Stutzka v. McCarville*, 420 F.3d 757, 761 n.2 (8th Cir. 2005) (court may take judicial notice of public records); Federal Rule of Evidence 201 (providing for judicial notice of adjudicative facts). For Mr. Moore, the Nebraska Supreme Court case number for search purposes is 95-485. I specifically take judicial notice of the filings in that matter using the Appellate Case Search function at nebraska.gov/justice.

Before the present one, the Nebraska Supreme Court has given Mr. Moore seven execution dates. This time Mr. Moore wants his death sentence to be carried out, and he has directed his court-appointed lawyers to do nothing. Indeed, Mr. Moore has sought to have his lawyers dismissed. There is absolutely no doubt of his competence or his guilt. I will not allow the Plaintiff to frustrate Mr. Moore and the laws of the State of Nebraska by Plaintiff's last-minute lawsuit.

*Brief Background*

The drug protocol that will be used to kill Mr. Moore has been publicly available since November 9, 2017, when Director Frakes publicly notified another death row inmate of the four drugs that would be used. On January 19, 2018, Director Frakes gave the same public notice to Mr. Moore. *See* Nebraska Department of Corrections, *NDCS Provides Notice of Substances to be Employed in an Execution by Lethal Injection* (January 19, 2018).[2] The four drugs that are to be used to carry out the death penalty are: (1) Diazepam; (2) Fentanyl Citrate; (3) Cisatracurium Besylate; and (4) Potassium Chloride.

On April 3, 2018, the Nebraska Attorney General sought a death warrant from the Nebraska Supreme Court. On May 25, 2018, the State of Nebraska filed a motion to expedite consideration of the motion for execution warrant. Attached to that motion was an affidavit of Director Frakes that represented under oath the following:

> 5. The Nebraska Department of Correctional Services has possession of the substances to be administered for execution by lethal injection, all of which have expiration dates as follows:
>
>    a. Diazepam, expiration date of September 1, 2019;
>    b. Fentanyl Citrate, expiration date of August 31, 2019;

---

[2] Available at https://corrections.nebraska.gov/ndcs-news-releases?page=2.

      c.      Cisatracurium Besylate, expiration date of October 31, 2018; and

      d.      Potassium Chloride, expiration date of *August 31, 2018.*

6.      The substances were obtained from a licensed pharmacy in the United States, and have been chemically analyzed and verified as required by 69 Neb. Admin. Code, ch. 11, § 008.

(Italics in original.)

On July 5, 2018, the Nebraska Supreme Court issued the death warrant. The court set the execution date for August 14, 2018, at a time to be chosen by the Department of Corrections. The Department of Corrections decided to execute the warrant at 10:00 a.m.

On July 24, 2018, the President and Chief Executive Officer of the Plaintiff sent a letter to the Governor of Nebraska, presumably by United States mail. (Filing No. 1-6, Ex. E to the Complaint.) Noting that he had written "your predecessor on more than one occasion regarding lethal injection," the author made a demand upon the Governor. The author demanded that "you immediately disclose the quantities, lot numbers, inventory logs, and invoices for any Fresenius Kabi drugs the state may have acquired for executions, and that you return any such drugs to us without delay." According to the Plaintiff, in a letter dated July 31, 2018, and mailed August 1, 2018, an aide to the Governor responded that Plaintiff's letter was construed as a public records request and that the Governor did not have custody of those records. (Filing No. 11 at CM/ECF p. 3 n.1.)

After the close of business on Tuesday, August 7, 2018, and at 5:55 p.m., the Plaintiff filed the complaint in this matter. The Plaintiff alleged that it manufactured and distributed Cisatracurium Besylate ("Cisatracurium") and Potassium Chloride ("KCL"). It alleged that the Nebraska Department of Corrections planned to use both

of these drugs to execute Moore, and the Plaintiff suspected that these drugs had been obtained improperly from distributors doing business with the Plaintiff.

The complaint does not seek damages. It seeks injunctive and declaratory relief. It sets forth six counts.

Count I seeks a temporary restraining order prohibiting Defendants from employing the Cisatracurium and KCL improperly or illegally obtained from Plaintiff in the execution of Mr. Moore. Count II alleges tortious interference with business relationships in that one or more of the Defendants are alleged to have obtained Cisatracurium and KCL in violation of Plaintiff's policies and distribution agreements. Count III sets out a section 1983 claim alleging that the Defendants, acting under color of state law, through the procurement and threatened use of Cisatracurium and KCL, will proximately cause interference with interstate commerce if they do not return the drugs. Count IV alleges another section 1983 claim based upon alleged violation of the Due Process Clause because of the Defendants' refusal to return the two drugs and the lack of any state-law procedure to contest the use of Plaintiff's products in executions. Count V is a replevin action seeking return of the Cisatracurium and KCL obtained from Plaintiff or from its distributors. Count VI is a declaratory judgment action seeking a declaration that Plaintiff is entitled to return of the Cisatracurium and KCL and a declaration that the Defendants must refrain from using these products in Nebraska's lethal injection protocol.[3]

---

[3] Where, as here, declaratory relief is sought, courts are particularly reluctant to issue such relief to halt matters involving state-law enforcement. Mary Kay Kane, 10B Fed. Prac. & Proc. Civ. § 2759, Discretion of Court (4th ed.) ("[T]he courts particularly are reluctant to resolve important questions of public law in a declaratory action and *under usual circumstances will not use declaratory judgments to halt state-law enforcement.*") (footnote omitted & emphasis added). *See also Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (describing the "nonobligatory nature" of the remedy provided in the Declaratory Judgment Act).

On Wednesday, August 8, 2018, after I had denied Plaintiff's request for expedited discovery[4], I conferred with counsel during an on-the-record telephone conference. I gave counsel the opportunity to select from various dates and times for the temporary restraining order hearing and noted my availability on Thursday, Friday, and Monday. Counsel requested a hearing on Friday, and accordingly, I set the matter for 3:00 p.m. on that date. It was further agreed that there would be no live testimony, and the parties intended to rely solely upon affidavits. I gave Defendants until the close of business on Thursday, August 9, 2018, to respond. The temporary restraining order hearing has been held as scheduled. I now deny the motion.

### *Dataphase*

In *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981), the court, sitting en banc, clarified the standard district courts should apply when considering a motion for preliminary injunctive relief:

> (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase*, 640 F.2d at 114. "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

---

[4] I denied the request for expedited discovery (Filing Nos. 7-1 & 7-2) because, among several other reasons, it was too broad. It sought information (quantities, lot numbers, inventory logs, and invoices) on *all* substances to be used in the execution and not merely the two drugs at issue.

5

I believe the *Dataphase* case must be applied to requests for a temporary restraining order. *See, e.g., S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989) (affirming district court's issuance of preliminary injunction after expiration of TRO where district court applied *Dataphase* standard in analyzing TRO; noting that the district court "held a hearing at which it indicated that Eighth Circuit standards favored the granting of a temporary restraining order (TRO). *See Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 112 (8th Cir.1981).").

I note a slight quirk in the "merits" factor analysis. *See Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). *Rounds* explains that the "substantial probability of success on the merits" standard is appropriate when a party is seeking to enjoin "'governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes.'" *Id.* (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). As to cases "where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes," "district courts should still apply the familiar 'fair chance of prevailing' test." *Id.* Here Plaintiff seeks, in effect, to enjoin enforcement of the duly enacted death penalty. Regardless, Plaintiff cannot prevail under either standard.

*Analysis*

I will examine each of the four *Dataphase* factors separately. After that, I will synthesize those factors and explain my conclusion.

*The threat of irreparable harm to the movant*

Primarily, the Plaintiff claims that its reputation will be irreparably harmed if I allow the execution to proceed using drugs manufactured and distributed by Plaintiff. There are serious problems with Plaintiff's assertions. Although preliminary relief may

be ordered to prevent harm to a movant's reputation and goodwill, "a finding of reputational harm may not be based on 'pronouncements [that] are grounded in platitudes rather than evidence.'" *Titaness Light Shop, LLC v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (unpublished) (quoting *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)).

First, there is *no* evidence that the Cisatracurium that will be used in the execution was manufactured or distributed by the Plaintiff. Indeed, the Plaintiff admits that there are two other firms who manufacture and distribute the drug in the United States. (Filing No. 11 at CM/ECF p. 4.) There is no way of knowing whether the Plaintiff's Cisatracurium will be used, and therefore, no reason for anyone to think that the Plaintiff will somehow be complicit in the execution of Mr. Moore. That being true, Plaintiff's claim of irreparable injury as to this drug fails completely.[5]

Second, the claim of injury in fact—let alone irreparable injury—made by Plaintiff regarding both drugs is far too speculative. The Plaintiff worries that if it is in any way associated with the execution, its reputation will be harmed because many health care professionals, investors, much of the public, and indeed even the European Union, detest the death penalty. Plaintiff worries that those persons or entities will take out their fury on the Plaintiff.

The Plaintiff has made it widely known that it takes active measures to prohibit the use of any of its drugs for the purpose of executions. For example, there is evidence that since at least August 29, 2012, the Plaintiff has sought to prohibit all its distributors from selling various restricted products to state and federal prisons. (Filing

---

[5] Plaintiff is on somewhat stronger ground when it comes to KCL. Evidence has been presented that the Department of Corrections is in possession of 30-milliliter vials of KCL in a specific concentration and "[P]laintiff is the only manufacturer of which it is aware" that sells such 30 ml. vials of the drug in that specific concentration. (Filing No. 11 at CM/ECF p. 2.)

No. 9 at CM/ECF p. 81 ¶¶ 6 & 7; Filing No. 9 at CM/ECF pp. 83-84 ¶ 3(b).)[6] Moreover, over the years, the Plaintiff has written several letters to various Nebraska Governors making the company's position well-known and very publicly so. Indeed, this lawsuit has generated world-wide coverage of the Plaintiff's desire to avoid any association with the death penalty. *See*, *e.g.*, French Press Agency, *German drug maker sues to halt planned execution in Nebraska*, The Guardian (Wednesday, August 8, 2018). Consequently, there is no reason for a rational actor to conclude that the Plaintiff will bear any responsibility for Mr. Moore's death, and thus, there is no rational basis to conclude that Plaintiff will suffer irreparable injury.

To the extent the Plaintiff makes other claims of irreparable injury, they are of the "make weight" variety. For example, it is hard to believe that withholding the small amount of KCL in the possession of Nebraska will have any impact on interstate commerce or the alleged national or world-wide shortage of the drug. Moreover, given the fact that the KCL held by Nebraska is set to expire this month, it could not be redistributed to address any shortage in any event.

*The state of balance between this harm [harm to the movant] and the injury that granting the injunction will inflict on other parties litigant*

As noted above, and at least at this point, the harm to Plaintiff if I do nothing seems vanishingly small to none at all. On the other hand, the State of Nebraska will be greatly and irreparably harmed if I grant the Plaintiff the relief it seeks.

I start by recognizing the elephant in the room. The Nebraska Death Penalty Repeal Veto Referendum, also known as Referendum 426, was held on November 8,

---

[6] There is an interesting question, however, whether Plaintiff failed to add the two drugs at issue to the restrictions *until June 22, 2018*. (*Compare* Filing No. 9 at CM/ECF p. 83 ¶ 2 (2012 controls apparently limited to Diprivan and Propofol) *with* Filing No. 9 at CM/ECF pp. 85-86 (June 22, 2018, control apparently adding Cisatracurium, KCL, and other drugs).)

2016. The measure asked voters whether they wanted to repeal or maintain a law passed by the Nebraska Legislature that eliminated the death penalty. Voters overwhelmingly (about 60%) repealed the death penalty ban implemented by LB 268 and reinstated the death penalty in the State of Nebraska. The will of the people, as very currently understood, is plain.

With the elephant visualized, if I temporarily stay the execution to "protect" Plaintiff, I will frustrate the will of the people. The Nebraska Supreme Court after careful and full consideration has *ordered* that the death penalty be implemented on August 14.[7] The supplies necessary to effectuate the command of the Nebraska Supreme Court will begin to expire on August 31, 2018. One of those drugs is KCL. It would simply be impossible to implement the death penalty before that expiration date if I granted the temporary restraining order at this time given the administrative and legal hoops that would have to be jumped through.

Plaintiff argues that the Defendants will suffer no harm because, after all, any temporary restraining order would merely delay things. Respectfully, that argument is laughable. Let's be honest. As the Supreme Court recently recounted, "anti-death-penalty advocates [have] pressured pharmaceutical companies to refuse to supply the drugs used to carry out death sentences." *Glossip v. Gross*, 135 S. Ct. 2726, 2733 (2015). Numerous lawsuits have been initiated around the country for the purpose of undermining the states' ability to carry out executions. *See*, *e.g.*, *Zink v. Lombardi*, 783 F.3d 1089, 1106 (8th Cir. 2015) ("In this capital litigation, it should be remembered that one stated objective of the prisoners' lawsuit is to pressure the State's

---

[7] "IT IS FURTHER ORDERED that Scott R. Frakes, Director of the Nebraska Department of Correctional Services, shall proceed on Tuesday, August 14, 2018, between the hours of 12:01 a.m. and 11:59 p.m., to carry said sentence of death into execution by administering to appellant, Carey Dean Moore, an intravenous injection of a substance or substances in a quantity sufficient to cause death, as provided by law."

suppliers and agents to discontinue providing the drugs and other assistance necessary to carry out lawful capital sentences."). It is therefore no surprise that the Legal Director of the Nebraska ACLU has filed an affidavit in support of Plaintiff in this case. (Filing No. 9 at CM/ECF pp. 22-23.)

Decades have slipped by since Mr. Moore was sentenced to death. The people of Nebraska have spoken. Any delay now is tantamount to nullifying Nebraska law, particularly given the rapidly approaching expiration of two of the drugs and the total absence of any feasible alternatives. (*See* Affidavit of Director Frakes, Filing No. 26-1 at CM/ECF pp. 5-6 ¶¶ 15-18.) For example, "I have attempted to purchase additional substances to be administered for execution by lethal injection from the supplier who supplied the current substances. That supplier is unwilling to provide additional substances." (*Id*. at CM/ECF p. 5 ¶ 17.) Moreover, "I do not, at present nor at any time in the future, have an alternative supplier for any of the four substances to be administered for execution by lethal injection." (*Id*. at CM/ECF p. 6 ¶ 18.)

In short, the balance of the harms tips heavily in favor of the Defendants.

*The Merits*

To say the least, this is a very strange suit. There is virtually no legal authority that is directly on point regarding any counts of the complaint.

Factually, Director Frakes has sworn that:

> 7. The substances were obtained from a licensed pharmacy in the United States, and have been chemically analyzed and verified as required by [the Nebraska Administrative Code].

> 8. The Nebraska Department of Correctional Services did not obtain any of the substances in its possession by any fraud, deceit or misrepresentation by the Department or, to the best of the affiant's knowledge, by any fraud, deceit or misrepresentation by any official of the State of Nebraska.
>
> 9. The Nebraska Department of Correctional Services did not engage in any measures to circumvent Fresenius Kabi's distribution control.
>
> 10. The Nebraska Department of Correctional Services does not and did not have any contract with Fresenius Kabi.

(Filing No. 26-1 at CM/ECF p. 3.)

Unless Director Frakes is lying, it would seem that Plaintiff will have a rough row to hoe on any of the claims asserted in the complaint. In short, I cannot say that the Plaintiff has a "substantial probability of success on the merits." Nor can I say that Plaintiff has a "fair chance of prevailing."

*The Public Interest*

The public interest weighs heavily in favor of Defendants. Many people of good faith object to the death penalty. However, the electoral processes of Nebraska have worked as they were intended. The Nebraska Legislature decided to kill the death penalty, and after that, and very recently, the people decided to resurrect it. While I have no beef with corporations—German or otherwise—I cannot say with a straight face that the public interest in any way favors the Plaintiff. Sure, the Plaintiff just might, although it is very doubtful, suffer harm to its reputation. But the public interest

11

is far broader than corporate self-interest. In this case, it has everything to do with the functioning of a democracy.

*Conclusion*

Although Plaintiff's counsel are some of the best and brightest, and they have made every conceivable argument possible for their client while under enormous time pressures, the Plaintiff has come up short on every *Dataphase* factor. It would be a gross abuse of my discretion if I granted a temporary restraining order. Therefore,

IT IS ORDERED that the motion for a temporary restraining order (Filing No. 7) is denied.[8]

DATED this 10th day of August, 2018.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge

---

[8] The parties are advised that no Magistrate Judge has been assigned to this case. Therefore, the parties should jointly contact me directly when they believe it is proper to further progress this case.